**MINSI RAIL CORPORATION, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**JUST BORN, INC. and Scholl Lumber Company, Plaintiffs,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

Civ. A. Nos. 85–12, 85–13.

Special Court, Regional Rail Reorganization Act.

June 27, 1986.

John D. Heffner, Gerst & Heffner, Washington, D.C., for petitioner Minsi Rail Corp. and plaintiffs Just Born, Inc. and Scholl Lumber Co.

Alan E. Kleinburd, Dept. of Justice, Washington, D.C., for respondent U.S. of America.

Robert J. Grady, Robert S. Burk, General Counsel, Henri F. Rush, Deputy General Counsel, I.C.C., Washington, D.C., for respondent I.C.C.

Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Charles E. Mechem, Consolidated Rail Corp., Philadelphia, Pa., for defendant Consolidated Rail Corp.

Before GASCH, P.J., and BRYANT and WEINER, JJ.

## MEMORANDUM

GASCH, Presiding Judge:

These two related cases grow out of the attempt by Consolidated Rail Corporation ("Conrail") to abandon two tracks located in northeast Pennsylvania, under the expedited abandonment procedures of section 308 of the Regional Rail Reorganization Act ("§ 308").[1] These cases raise the novel question of whether Conrail's notice under § 308(c) that the tracks generate "insufficient revenues" is reviewable by this Court, either on appeal from the Interstate Commerce Commission or in a challenge by a private party. For the reasons stated below, the Court finds such notices are not reviewable, and therefore the Court will grant Conrail's motion to dismiss in both cases.

## I. FACTS

On October 18, 1983, Conrail filed a "Notice of Insufficient Revenues" with the Interstate Commerce Commission ("ICC") pursuant to § 308(c), thereby taking the first step toward abandoning two legs of railroad track known as the Minsi Trail Branch (1.0 miles) and the Freemansburg Industrial Track (2.9 miles) (hereinafter referred to as "the lines"). On June 23, 1984, Conrail filed an application with the ICC seeking approval to abandon the lines, as provided in § 308(c). The statute permits interested parties to file offers of financial assistance to buy or subsidize operations along the lines that Conrail intends to abandon. *See* § 308(c)–(d). If no such offers are forthcoming, the ICC must grant Conrail's abandonment application. If such offers are made, the Commission must evaluate them under procedures laid out in 49 U.S.C. § 10905(d)–(f). *Id.* In this case, two industrial shippers who relied on the lines, Just Born, Inc. and Scholl Lumber, formed the Minsi Rail Corporation ("Minsi"), which filed an offer of financial assistance on September 21, 1984.

Under the procedures established by § 308, the ICC found Minsi financially responsible, and Minsi entered into negotiations with Conrail for sale of the lines. Such efforts failed, and Minsi asked the ICC to use its authority to set the terms of the sale. On December 28, 1984, the ICC issued a decision establishing a price of $269,883. Under the statute, Minsi had ten days to accept or reject this figure. Minsi did not accept, but on January 17, 1985, filed a petition with the ICC asking it to reopen the proceedings and to stay its December 28 decision. By order dated January 18, 1985, the ICC declined to do so and certified abandonment of the lines. On February 1, 1986 Minsi petitioned this Court to review the ICC's orders. Three days later Conrail embargoed the lines as permitted by the January 18, 1985 order.

---

**1.** Section 308 was passed as section 1156 of the Northeast Rail Service Act, approved by Congress as part of the Omnibus Budget Reconcilia-

tion Act of 1981. It amended the Regional Rail Reorganization Act by adding a new section 308, now codified at 45 U.S.C. § 748.

Service was reinstated for a brief period while Minsi and Conrail attempted to negotiate a sale, but was halted when negotiations broke down. On February 20, Minsi asked this Court to stay termination of the service. Conrail was permitted to intervene. *See Minsi Rail Corp. v. I.C.C.*, Spec. Ct. RRRA No. 85–3. Before the Court could act, the parties resumed negotiations and agreed to preserve the status quo. Under an agreement reached March 26, 1985, Conrail resumed service for six months while the parties executed a sales agreement setting the price at $110,000. Minsi agreed to and did withdraw its petitions pending with this Court while awaiting execution of the sale. Due to disputes over nonprice terms, including the issue of who would operate the lines after the sale, and a dispute over how best to force the city of Bethlehem, Pennsylvania to repair a damaged storm drainage system that was endangering the tracks and necessitating expensive repairs, the sale was never consummated. On August 30, 1985, Minsi again petitioned the Court to review the ICC orders. Defendant Conrail opposed the stay and moved to dismiss.

While that motion was pending, Just Born, Inc. ("Just Born") and Scholl Lumber ("Scholl"), in their individual capacities, petitioned the Court for injunctive and declaratory relief on October 1, 1985. As shippers who would be harmed by Conrail's abandonment of the lines, they challenged Conrail's notice that the lines were unprofitable, and asked the Court to declare the abandonment unlawful on a theory that § 308 permits only the abandonment of un-

profitable lines. Conrail moved to dismiss the complaint for failure to state a claim.

The Court scheduled oral arguments on these matters on December 13, 1985. At that time, the parties represented to the Court that negotiations had resumed. Therefore, the Court did not hear oral argument and issued an order granting the parties sixty days to reach a settlement. If no agreement was reached, the Court stated it would rule on the outstanding motions without further oral argument. No agreement was reported to the Court. For the reasons stated below, the Court will grant Conrail's motions to dismiss.

## II. DISCUSSION

These motions raise a number of complex procedural issues, but a question key to ruling on both of them is this: May the Court review Conrail's notice under § 308(c) that a line is generating "insufficient revenues"? This issue is raised by Minsi in connection with its petition to review the ICC Order of January 18. *See* Precis: Written Objections of Minsi Rail Corporation, Sept. 24, 1985, p. 11. The issue is also raised by the plaintiffs in *Just Born* who come directly to this Court seeking an injunction. *See* Complaint, ¶¶ 12 and 14. Because resolution of this issue is necessary to any determination of the motions, the Court will consider it first.

### A. *Judicial Assessment of Conrail's Profitability Determination*

Section 308 creates a dichotomy based on date.[2] Prior to December 1, 1981, Conrail

2. Section 308 states in relevant part:

(a) **General.** The Corporation may, in accordance with this section, file with the Commission an application for a certificate of abandonment for any line which is part of the system of the Corporation. Any such application shall be governed by this section and shall not, except as specifically provided in this section, be subject to the provisions of chapter 109 of title 49, United States Code [49 USCS §§ 10901 *et seq.*].

(b) **Application for abandonment.** Any application for abandonment that is filed by the Corporation under this section before December 1, 1981, shall be granted by the Commis-

sion within 90 days after the date such application is filed unless, within such 90–day period, an offer of financial assistance is made in accordance with subsection (d) of this section with respect to the line to be abandoned. (c) **Notice of insufficient revenues.** (1) The Corporation may, prior to November 1, 1985, file with the Commission a notice of insufficient revenues for any line which is part of the system of the Corporation. (2) At any time after the 90–day period beginning with the filing of a notice of insufficient revenues for a line, the Corporation may file an application for abandonment for such line. An application for abandonment that is filed by

could simply file an application for abandonment and such application would be granted if no offer of financial assistance was forthcoming within 90 days. *See* § 308(a)–(b). After that date, and at the time of the filing at issue herein, Conrail was required to take an additional step prior to abandonment; it had to first file a notice of "insufficient revenues" with the ICC. Ninety days later, Conrail could then file an application for abandonment. *See* § 308(c).

Plaintiffs argue that Conrail's § 308(c) determination must be reviewable by this Court under its broad grant of jurisdiction

the Corporation under this subsection for a line for which a notice of insufficient revenues was filed under paragraph (1) shall be granted by the Commission within 90 days after the date such application is filed unless, within such 90–day period, an offer of financial assistance is made in accordance with subsection (d) of this section with respect to such line.

(d) **Offers of financial assistance.** (1) The provisions of section 10905(d)–(f) of title 49, United States Code [49 USCS § 10905(d)–(f)] (including the timing requirements of subsection (d) thereof), shall apply to any offer of financial assistance under subsection (b) or (c) of this section.

(2) The Corporation shall provide any person that intends to make an offer of financial assistance under subsection (b) or (c) of this section with such information as the Commission may require.

(e) **Liquidation.** (1) If any application for abandonment is granted under subsection (b) of this section, the Commission shall, as soon as practicable, appraise the net liquidation value of the line to be abandoned, and shall publish notice of such appraisal in the Federal Register.

(2) Appraisals made under paragraph (1) shall not be appealable.

(3)(A) If, within 120 days after the date on which an appraisal is published in the Federal Register under paragraph (1), the Corporation receives a bona fide offer for the sale, for 75 percent of the amount at which the liquidation value of such line was appraised by the Commission, of the line to be abandoned, the Corporation shall sell such line and the Commission shall, unless the parties otherwise agree, establish an equitable division of joint rates for through routes over such lines.

(B) If the Corporation receives no bona fide offer under subparagraph (A), within such 120–day period, the Corporation may abandon or dispose of the line as it chooses, except that the Corporation may not dismantle

pursuant to § 1152 of NERSA, codified at 45 U.S.C. § 1105(a).[3] If the lines proposed for abandonment are in fact profitable, plaintiffs contend, the statute does not permit Conrail to abandon them. Conrail responds that once it has properly obtained an abandonment order from the ICC, Conrail's authority to abandon is absolute and not subject to judicial challenge. Conrail further contends that it may abandon lines that are "profitable" in that current revenues exceed current expenses, if they are "unprofitable" in the sense that continued operation and maintenance are not economically justifiable.[4]

bridges, or other structures (not including rail, signals, and other rail facilities) for 120 days thereafter. The Secretary may require that bridges or other structures (not including rail, signals, and other rail facilities), not be dismantled for an additional 8 months if he assumes all liability of any sort related to such property.

(4) If the purchaser under paragraph (3)(A) of this subsection abandons any line of the Corporation within five years after such purchase, the proceeds of any track liquidations shall be paid into the general fund of the Treasury of the United States.
45 U.S.C. § 748.

3. Section 1152 states:

(a) Notwithstanding any other provision of law, the special court shall have original and exclusive jurisdiction over any civil action—

(1) for injunctive, declaratory, or other relief relating to the enforcement, operation, execution, or interpretations of any provision of or amendment made by this subtitle, or administrative action taken thereunder to the extent such action is subject to judicial review;

(2) challenging the constitutionality of any provision of or amendment made by this subtitle;

(3) to obtain, inspect, copy, or review any document in the possession or control of the Secretary, Conrail, the United States Railway Association, or Amtrak that would be discoverable in litigation under any provision of or amendment made by this subtitle; or

(4) seeking judgment upon any claim against the United States founded upon the Constitution and resulting from the operation of any provision of or amendment made by this subtitle.
45 U.S.C. § 1105(a).

4. Conrail also contends that the lines in dispute here are, in any event, not profitable.

Examination of the statute does not help resolve this dispute. Some aid may be gleaned from the fact that Congress chose to use the phrase "insufficient revenues," rather than requiring Conrail to file a notice of "unprofitability". "Insufficient revenues" may encompass the notion of marginal profitability.[5] However, the statute nowhere defines "insufficient revenues."

Because the statute provides no clear guidance, we must look to the legislative history to discover congressional intent. The streamlined abandonment process was included as part of the Northeast Rail Service Act of 1981, the aim of which was to stop Conrail from hemorrhaging federal funds and to make Conrail a profitable system. *See Rail Service Improvement Act of 1981,* H.R.Rep. No. 97–153, 97th Cong., 1st Sess. pp. 1, 3 (1981). Under § 308(a), Congress chose to permit Conrail to shed trackage without having to comply with abandonment procedures of 49 U.S.C. § 10903 *et seq.,* which required the ICC to determine whether the public convenience or necessity would be served by abandonment. *See* 49 U.S.C. § 10903(a). It did so to provide Conrail with "an unobstructed opportunity to become a solvent operation." *Consolidated Rail Corp. v. County of Monroe,* 558 F.Supp. 1387, 1389 (Spec. Ct.R.R.R.A.1983), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3089, 77 L.Ed.2d 1350 (1983).

The legislative history makes it clear that Conrail "solely shall determine what is contained in the notice of insufficient revenues." 127 Cong.Rec. S9064 (Daily Ed. July 31, 1981). Because of this history, the ICC has taken the position that it is without authority to question Conrail's notice of insufficient revenues. *Conrail Abandon-ments Under NERSA,* 365 I.C.C. 472, 472–73 (1981). The Commission stated, "In essence section 308 requires us to grant, *without examination,* any Conrail abandonment application unless an offer of financial assistance is timely filed." *Id.* at 472 (emphasis added). The Congressional Record goes on to state that Conrail is expected

> to give particular consideration to lines where state or local governments have expressed an interest. The Corporation [Conrail] is given broad authority by this section, which is necessary because of the financial circumstances of the Corporation, but the authority must be exercised with the utmost regard for the transportation needs of states and local communities.

*Id.* Plaintiffs find solace in this passage, arguing that Congress intended Conrail to take into account local transportation needs before abandonment, and that this Court must review Conrail's notices of insufficient revenues to assure that Conrail does so.[6]

■ If the Court were to review Conrail's determination of insufficient revenues in abandonment cases, either upon appeal from ICC orders or in direct private actions, it would subject the abandonment process to the very expense and delay Congress sought to avoid in § 308. Furthermore, Congress provided no standard by which this Court would measure "insufficient revenues". If the Court were, as plaintiffs urge, to consider whether Conrail had acted "with the utmost regard" for local transportation needs, it would be applying something very like the public convenience and necessity test from which

---

**5.** In nonexpedited abandonments under 49 U.S.C. § 10903 *et seq.,* carriers may abandon marginally profitable lines. *See Simmons v. United States,* 698 F.2d 888, 894–95 (7th Cir. 1983); *Commonwealth of Pennsylvania v. United States,* 361 F.Supp. 208, 219 (M.D.Pa.), *aff'd,* 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973).

**6.** To support this statement, plaintiffs proffered the affidavit of Rep. Donald Ritter, who represents the localities where the lines at issue here are located, and who was a member of the committee that drafted the legislation. With due respect to Mr. Ritter, the Court notes that *post hoc* statements of a single legislator concerning legislative intent are to be given little weight. *Cf. Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979); *Weinberger v. Rossi,* 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982) (citations omitted).

Congress has exempted Conrail. Absent any other guidance from Congress as to what margin of profit or loss constituted "insufficient revenues", Conrail abandonments would become mired in a series of litigation if this Court attempted to work out the proper standard for setting net liquidated valuations of lines. This would undercut congressional intent that Conrail abandonments be expedited. Therefore, based on the statutory language and its legislative history, the Court determines that it was not the intent of Congress that it review Conrail's notices of insufficient revenues upon appeal from the ICC, or that the Court recognize a private right of action under § 308(c).[7] *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

Plaintiffs protest that if neither this Court nor the ICC reviews Conrail's § 308(c) determinations, Conrail may abandon profitable track to the detriment of shippers and local communities. Logic dictates against this conclusion. Conrail is unlikely to abandon profitable lines, and if the lines truly are profitable, there will be willing purchasers to continue service. In any event, it is inevitable that some shippers will lose convenient transportation as a result of Conrail abandonments. However, it was precisely the overriding intent of Congress in passing NERSA to end federal subsidization of Conrail lines used by shippers who did not pay the true cost of operating the line. If they can pay the costs, § 308 provides a mechanism for them to subsidize the line. Therefore, the Court's decision not to review Conrail § 308(c) notices is unlikely to result in unfettered abandonment of profitable track by Conrail, and it will not result in any harm to shippers beyond that implicitly condoned by Congress.

Having determined that it may not review Conrail's § 308(c) notice of insufficient revenues, the Court will now consider the remaining issues raised by Conrail's motions in these cases.

### B. *Conrail's Motion to Dismiss in Minsi Rail*

Conrail first contends plaintiff Minsi's petition for review of the ICC abandonment order and refusal to issue a stay should be dismissed because it was brought in breach of an agreement between the parties not to litigate. No breach of contract claim is before the Court,[8] and the Court declines to get involved in contract interpretation.

Conrail next contends the petition should be dismissed as moot and frivolous, because it challenges agency actions which either have been settled between the parties, or are not reviewable by the Court. Minsi's pleadings may be read as raising three legal issues: first, it asks the Court to review the ICC order of December 28, 1984, setting a price for the lines; second, it asks the Court to review the ICC order of January 18, 1985, denying its petition to stay the proceedings and certifying abandonment of the lines; and third, it challenges the whole proceeding because it rests on Conrail's alleged abuse of the abandonment process by seeking to abandon an allegedly profitable line.

■ Conrail contends the December 28 order setting the net liquidated value of the lines is unreviewable because the issue was mooted by the parties' later agreement to transfer the lines for $110,000. Minsi counters that it agreed to that figure only

---

**7.** An analogy may be drawn between the nonreviewability of Conrail's section 308(c) notices and the nonreviewability of agency action where the matter is left solely to agency discretion under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2). Even though courts are given broad jurisdiction to review agency actions under 5 U.S.C. § 702, a court may not review an agency's discretionary act where there "is no law to apply," *e.g.,* no standard against which to measure the agency's action. *See Citizens to*

*Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971).

**8.** Nor should it be. This Court's jurisdiction is limited to issues critical to the interpretation of the Regional Rail Reorganization Act, and does not extend to "problems which could be effectively dealt with by other courts." *Consolidated Rail Corp. v. State of Illinois,* 423 F.Supp. 941, 948 (Sp.Ct.R.R.R.A.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1111, 51 L.Ed.2d 542 (1977).

under duress because of Conrail's threat to immediately embargo the lines. The Court notes that Conrail was merely threatening to do that which it had legal authority to do and that the resulting bargain appears not to be so unfair to Minsi as to amount to duress. *See generally* Restatement of Contracts 2d § 176(2). However, again, the Court does not wish to get into questions of contract interpretation. *See supra*, note 8. Minsi may wish to challenge the contract elsewhere, but Minsi does concede it accepted the price. *See* Precis: Written Objections of Minsi Rail Corporation, Sept. 24, 1985, p. 8. The sole legal effect of the December 28 order was to set a sales price; therefore, the agreement moots the need for review of that order.[9]

The Court further agrees with Conrail's contention that Minsi's petition to review the January 18 abandonment order is frivolous. Rather than being "patently defective," as charged by Minsi, *see* Precis: Motion for Stay Pending Judicial Review of Minsi Rail Corporation, filed August 30, 1985, p. 8, the January 18 order clearly explained that by regulation the ICC had notified all parties that it would not entertain petitions to reopen financial assistance proceedings, and that a party's sole remedy lay in judicial review. *See* Docket No. AB–167 (Sub.-No. 626N), Conrail Abandonment in Lehigh and Northampton Counties, Pa., n. 2 (ICC Jan. 18, 1985). The Court further notes the ICC was without discretion to withhold a certificate of abandonment if an offer of financial assistance was not forthcoming within ten days of its order setting a net liquidation value. *See* § 308(d), which refers to 49 U.S.C. § 10905(f)(2). As Minsi made no such offer within the prescribed time, the Commission could not delay issuing the certificate. Therefore, the

Court finds Minsi's petition to review the January 18 order has no basis in law, and should be dismissed.

Finally, the Court has already determined that it is without authority to review Conrail's notices of insufficient revenues upon appeal from an ICC order. Therefore, to the extent that Minsi bases its petition for review on the ground that Conrail is abandoning an allegedly profitable line, the petition is without merit. For the foregoing reasons, the petition of Minsi shall be dismissed.[10]

### C. *Motion to Dismiss Complaint of Just Born*

Just Born and Scholl ask the Court to declare unlawful Conrail's abandonment of the lines because the lines are allegedly profitable. The complaint rests implicitly on the theory that the parties have a private cause of action under § 308(c). Due to the Court's determination that they do not, Conrail's motion to dismiss for failure to state a claim must be granted.

### III. CONCLUSION

The petition to review filed by Minsi must be dismissed as raising issues that are moot or that are frivolous because they are without a basis in law. The complaint of Just Born and Scholl must be dismissed for failure to state a claim upon which relief may be granted.

---

9. In any event, the Court would not find the ICC's December 28 order arbitrary or capricious. *See* Section 1152(c) of NERSA setting the standard for judicial review by cross reference to 5 U.S.C. § 706(2)(A)–(D). The Commission's decision was fully explained, was premised on a complete record, considered the valua-

tion studies of both parties, and reviewed all the relevant factors.

10. It is therefore unnecessary for the Court to consider Minsi's petition to stay the effect of the ICC orders.